UNDER SEAL

NOV - 8 2019

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

2:19mj 594

AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR AN ARREST WARRANT

I, Desiree Maxwell, being duly sworn, do hereby state the following is true to the best of my knowledge and belief:

## INTRODUCTION

1. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code. I have been employed as a Special Agent with the Federal Bureau of Investigation (FBI) since April 2009. I am currently assigned to investigate Health Care Fraud within the Norfolk Division of the FBI where I work in a Task Force with investigators from other law enforcement agencies. I worked on a Violent Gang Squad in Philadelphia (Pennsylvania) prior to transferring to the Norfolk Division. Prior to being employed as a Special Agent, I served as a Detective with the Alexandria (Virginia) Police Department, where I was employed for over seven years.

2. As a Special Agent, I have participated in all of the normal methods of investigation, including, but not limited to, electronic surveillance, physical surveillance, interviews of witnesses, execution of search and arrest warrants, and the use of confidential informants and cooperative witnesses. I have also taken part in long-term investigations utilizing Title III interception of wire and electronic communications, as well as undercover operations. I have received specialized training in, and have participated in, criminal investigations involving violation of federal healthcare laws and associated crimes.

3. I am a part of a joint investigation with the Medicaid Fraud Control Unit (MFCU) of the Virginia Office of the Attorney General; the Defense Criminal Investigative Service (DCIS); and the Department of Health and Human Services, Office of Inspector General (HHS-OIG), who have all conducted an investigation of the offenses described in this affidavit. As a result of my investigation, a review of reports made by other law enforcement officers, and in speaking with other law enforcement officers and officials who have been involved in the investigation, I am familiar with the circumstances of this on-going investigation. I have not included each and every fact known to me in this affidavit, but only the facts I believe are necessary to establish probable cause to believe that JAVAID PERWAIZ has engaged in the crimes of Health Care Fraud, in violation of 18 U.S.C. § 1347, and False Statements Relating to Health Care Matters 18 U.S.C. § 1035.

## Case Initiation

4. The investigation of JAVAID PERWAIZ, M.D., was initiated in September 2018 after the FBI received a tip from a hospital employee who suspected PERWAIZ, a certified obstetrician-gynecologist (OB/GYN), was performing unnecessary surgeries on unsuspecting patients. According to the employee, PERWAIZ's patients advised hospital staff they were present for their "annual clean outs." In many instances, the patients were not aware of the procedures they were undergoing. Additionally, hospital staff had a difficult time keeping up with PERWAIZ as he ran from procedure to procedure.

## Background

5. In 1982, PERWAIZ lost hospital privileges at Maryview Hospital, Portsmouth, VA due to poor clinical judgment and for performing unnecessary surgeries. PERWAIZ was previously investigated by the Virginia Board of Medicine for performing surgeries, predominantly hysterectomies, without appropriate medical indications and contrary to sound medical judgment. However, he was ultimately censured for poor record keeping. In 1996, PERWAIZ pled guilty to two counts of tax evasion. His medical license was temporarily revoked, but later reinstated in 1998. PERWAIZ has been the subject in at least eight malpractice lawsuits in which plaintiffs allege he falsified patient records to justify a medical procedure, failed to use less invasive techniques, performed as many as 30 surgeries in one day, and provided substandard care that resulted in irreparable permanent injuries to three patients and life threatening injuries to another two patients.

## Analysis of Medicaid Insurance Claims Detail

6. A preliminary review of Medicaid claims detail revealed that certain patients are subjected to repeated surgical procedures, with some procedures occurring on an annual basis. From January 2014 to August 2018, PERWAIZ performed a surgical procedure on 40% of his Medicaid beneficiaries which amounted to 510 patients. Of the 510 patients, approximately 42% of them underwent two or more surgeries. Medicaid is a health care benefit program as defined in 18 U.S.C. § 24(b)

7. The precursory review further revealed PERWAIZ's propensity to conduct bundled surgeries involving laparoscopy, dilation & curettage (D&C), and lysis of adhesions. A laparoscopy is a surgical procedure in which a fiber-optic instrument is inserted through the abdominal wall to view the organs in the abdomen or to permit a surgical procedure. A D&C is a surgical procedure in which the cervix is opened and a thin instrument is inserted into the uterus. This instrument is used to remove tissue from the inside of the uterus. Lysis of adhesions is a surgery to cut bands of tissue that form between organs. They are often caused by scar tissue that formed after an earlier surgery.

### Clear Lack of Informed Consent

8.  PERWAIZ performed annual D&C surgeries on patient J.L. based upon her own diagnosis that she had endometriosis. J.L. was a Medicaid recipient and PERWAIZ billed for unnecessary medical treatment to Medicaid based on alleged services he performed on J.L. J.L. sometimes called PERWAIZ to advise him that she was experiencing pain. On at least one occasion, PERWAIZ scheduled J.L. for a D&C without having her appear for an office visit. In 2011, PERWAIZ treated J.L. for an ectopic pregnancy. From 2011 to 2014, PERWAIZ routinely asked J.L. whether she was going to have another baby. In 2014, J.L. sought treatment from a fertility specialist who advised her both fallopian tubes were burnt down to nubs, making natural conception impossible. PERWAIZ had removed J.L.'s fallopian tubes without her consent or knowledge.

9.  In 2012, D.A. sought treatment from PERWAIZ following an abnormal pap smear. She was a Medicaid recipient and PERWAIZ billed for unnecessary medical treatment to Medicaid based on alleged services he performed on D.A. She had been previously diagnosed with Stage III Invasive Ductal Carcinoma (IDC), a highly aggressive breast cancer, for which she underwent a mastectomy. Following multiple pap smears and a colposcopy, D.A. was led to believe pre-cancerous cells were detected and that onset of cancer was imminent. PERWAIZ advised D.A. the best course of treatment was a hysterectomy, but she objected to invasive surgery. D.A. believed she and PERWAIZ reached a decision to move forward with an outpatient laparoscopic surgery in which only her ovaries would be removed. When D.A. awoke in recovery, she was shocked to discover PERWAIZ performed a total abdominal hysterectomy. During the procedure, PERWAIZ perforated D.A.'s bladder. D.A.'s creatinine rose to dangerous levels and she developed sepsis. D.A. was ultimately hospitalized for six days. D.A. acquired a copy of her medical record and discovered her hysterectomy was documented as an "elective surgery." D.A. further discovered there was no mention in her medical file of any "pre-cancerous cells." D.A. consulted with a different doctor and learned there were other less invasive procedures available, including medication.

10.  Witnesses allege that many women who returned to PERWAIZ for post-operative appointments did not know what surgery(ies) had been performed on them. Witnesses also alleged PERWAIZ routinely used the "C-word" (Cancer) to scare patients into having surgery.

### Hysteroscopies

11.  The Virginia Medicaid Department of Medical Assistance Services (DMAS) identified PERWAIZ as an outlier for in-office diagnostic hysteroscopies (CPT 58555). According to Medicaid analysis, PERWAIZ performed 86 in-office hysteroscopies in FY16 and 87 in FY17. By comparison, the next leading provider performed six in the same year. In December 2010, Total Scope, Inc. evaluated and inspected PERWAIZ hysteroscope, a Wolf scope 8989.33 Pan Histro and noted the following discrepancies: insertion tube dented, vision blurred, light fibers damaged, and tubing dented. The clean lens train, rods lens, distal assembly, achromat light post, and light all failed inspection. An annotation made by a third party contractor indicated the hysteroscope was "completely broken." The hysteroscope and its

attachments were repaired and returned to PERWAIZ on December 30, 2010. It has not been serviced since.

12. Witnesses allege regional anesthesia is never administered to patients undergoing in-office hysteroscopies. Properly performed, the procedure may cause pain. However, witnesses allege that no patient claimed they were in any more pain than the typical discomfort of a pap smear. Witnesses stated PERWAIZ performs the procedure in 5-10 seconds. This is insufficient time to pass the hysteroscope through the cervix and properly inspect the uterus. Even though the in-office hysteroscopies were improperly performed and were of little or no diagnostic value, they formed the basis of medical necessity justifications for ensuing surgical procedures.

13. On October 28, 2019, PERWAIZ consented to a voluntary interview wherein he advised agents that he performs in-office diagnostic hysteroscopies in 5-10 minutes. Furthermore, PERWAIZ stated he refrains from performing in-office hysteroscopies on younger and older patients because the procedure can be too painful for an office setting. Both assertions run contrary to witness statements.

## Surgeries

14. The Virginia Medicaid Department of Medical Assistance Services (DMAS) also identified PERWAIZ as an outlier for gynecological surgeries (CPT Codes 49320-58673). Investigators reviewed preauthorization paperwork submitted to Optima Health and Virginia Premier and noted boiler plate language used to describe patient symptoms. For example, PERWAIZ routinely noted enlarged uterus, bleeding for 8+ days, frequent menstruation every three weeks, cystic, pelvic pain, perineal pain, painful periods, no relief from NSAIDs, unable to take hormones due to high blood pressure, unable to examine uterus see weight, tender adnexa, and history of anemia.

15. The symptoms were not exactly the same but they were consistent across large swaths of patient encounters.

## Cystectomies & Myomectomies

16. A cyst is a sac-like pocket of membranous tissue that contains fluid, air, or other substances. Some cysts can resolve on their own following menstruation. According to the American College of Obstetricians and Gynecologists (ACOG), there are several treatment options for cysts. Choosing an option depends on the type of cyst and other factors. Treatment options include watchful waiting and surgery. Watchful waiting involves monitoring a cyst with repeat ultrasounds to see if the cyst has changed in size or appearance. Many cysts go away on their own after one or two menstrual cycles. A physician may recommend surgery if the cyst is large, causing symptoms, or if cancer is suspected.

17. According to ACOG, uterine fibroids are noncancerous growths of the uterus that develop from the muscle tissue of the uterus. Fibroids that do not cause symptoms are small, or occur in women nearing menopause, often do not require treatment. Certain symptoms such as

heavy or painful menstrual periods, bleeding between periods, rapid growth, infertility, or pelvic pain may signal the need for treatment.

18. Medications may reduce the heavy bleeding and painful periods that fibroids sometimes cause. Drug therapy includes birth control pills, Gonadotropin-releasing hormone agonists, or Progestin-releasing intrauterine devices.

19. Myomectomy is the surgical removal of fibroids while leaving the uterus in place. Fibroids do not regrow after surgery, but new fibroids may develop. If they do, more surgery may be needed. A hysterectomy is the removal of the uterus. The ovaries may or may not be removed as well. A hysterectomy is performed when other treatments have not worked or are not possible or the fibroids are very large. A woman is no longer able to have children after having a hysterectomy.

20. Witnesses allege that if a fibroid, cyst, or other abnormality is noted in an ultrasound, PERWAIZ frequently schedules the patient for surgery, even though standard protocol in most cases is to conduct a follow-up examination in six weeks. The investigation revealed the number of cases that progress to surgery far outweigh the number of abnormal ultrasound scans. Investigation revealed that on two occasions, PERWAIZ altered ultrasound reports to change a finding of simple cyst to a complex cyst in order to proceed to surgery.

21. In January 2019, L.G., is a 25 year old female and an existing patient of PERWAIZ. L.G.'s secondary insurance is Medicaid. She presented to the emergency room at Bons Secours Harbour View, Suffolk, VA in response to heavy and prolonged menstrual bleeding. L.G.'s hemoglobin test result was 3. As a result, she was transferred to Maryview Medical Center, Portsmouth, VA where she received three blood transfusions and a contraceptive injection of Depo-Provera. L.G. stopped bleeding a few hours after receiving the injection. L.G. remained in the Intensive Care Unit at Maryview for four days. During her hospitalization, L.G. underwent an ultrasound and was advised there was nothing detected in her ultrasound that warranted surgery. L.G. was specifically advised she did not have fibroids. The hospital staff advised L.G. that her excessive bleeding may have resulted from a hormonal imbalance or the possibility her uterine wall was too thick. By the time L.G. was discharged from the hospital, on or about January 9, 2019, she had stopped bleeding entirely.

22. On January 21, 2019, L.G. presented in PERWAIZ's office for a follow up appointment. At the time of this appointment, L.G. was not actively bleeding. In fact, L.G. had not experienced any bleeding following the Depo-Provera injection earlier in January 2019. Yet, in the progress note, PERWAIZ noted L.G. was experiencing long periods and clots and that she was possibly cystic. PERWAIZ directed L.G. to return for an ultrasound. During the encounter, PERWAIZ advised L.G. she had fibroids. On February 7, 2019, L.G. underwent an ultrasound wherein her uterus and ovaries were deemed within normal limits. No other findings were noted. At the time of this encounter, L.G. was not actively bleeding. In fact, L.G. had not experienced any bleeding following the Depo-Provera injection in January 2019. Yet, the same day, PERWAIZ entered a progress note in L.G.'s chart which reads, "Heavy bleeding persists with clots and severe cramping. Advised D&C and hysteroscopy."

23. On February 16, 2019, L.G. underwent a D&C, On March 4, 2019, L.G. presented to PERWAIZ's office for a post-operative appointment.

[handwritten annotation: ↓ performed by PERWAIZ, and PERWAIZ submitted the claim for the D+C procedure to a health care benefit program. The proc] [initials: JEM] [initials: RJK]

24. On September 11, 2019, L.G. presented to PERWAIZ's office to address what she described as pain and a fluttering sensation in her stomach. L.G. was concerned her fibroids were growing back, based on information PERWAIZ relayed to her in her January and/or February encounter. At the time of this appointment, L.G. was not actively bleeding. In fact, L.G. had not experienced any bleeding following the Depo-Provera injection in January 2019, save for 2-3 days of light bleeding following her D&C. Yet, PERWAIZ entered a progress note that reads, "Complaint of severe cramps and prolonged vaginal bleeding." PERWAIZ directed L.G. to return for an ultrasound.

25. On September 26, 2019, L.G. underwent an ultrasound wherein her uterus and ovaries were deemed within normal limits. There were no other findings. The existence of fibroids was not documented. During the consultation, PERWAIZ advised L.G. she had a small fibroid that returned. He recommended removing it before it continued to grow. L.G. was subsequently scheduled for a laparotomy and myomectomy on October 18, 2019. A laparotomy is a surgical incision in the abdominal cavity in preparation for surgery. It should be noted that PERWAIZ made no entries in L.G.'s patient chart documenting the existence of fibroids. However, in a surgical plan for laparotomy and myomectomy, PERWAIZ listed L.G.'s primary diagnosis as Uterine Fibroids (D25.9). L.G.'s secondary diagnosis of menorrhagia was contrary and inconsistent with L.G.'s account.

26. It was L.G.'s understanding that PERWAIZ would make a vaginal approach. She was not anticipating an abdominal incision. On October 10, 2019, L.G. contacted PERWAIZ by phone and voiced concerns about her surgery. During the approximately 90-second conversation, PERWAIZ made the following statements:

| | |
|---|---|
| L.G.: | I just have some concerns. |
| PERWAIZ: | We're just removing the fibroids |
| L.G.: | Okay, and how long will I need to be off work because I am getting ready to start a new job |
| PERWAIZ: | Well I would probably allow, let's see we're doing it Friday, not that Monday but the following Monday you could |
| L.G.: | So I would have to be off for a week? |
| PERWAIZ: | Yea, I would allow it maybe three days you could go but I would allow maybe a week |
| L.G.: | That's a lot longer than last time, uh, do you know why it's going to be so much longer? |
| PERWAIZ: | Because when I'm making the bikini incision. It's not going to be through the belly button, it's going to be through the bikini incision |
| L.G.: | And you didn't do that last, you didn't, you didn't cut me in that area last time, so why, why are you cutting me in that area this time? |
| PERWAIZ: | Because we are removing the tumor, these are *big tumors* you cannot remove through your belly button incision. |

[initials: RJK] [initials: JEM]

| | |
|---|---|
| L.G.: | Okay, well are there any other options as far as the surgery cause that, that sounds kind of scary. |
| PERWAIZ: | Okay, well then don't do it. We'll cancel it and hopefully you get pregnant. How bout that? |
| L.G.: | Okay |
| PERWAIZ: | You don't have to do it |
| L.G.: | Alright |
| PERWAIZ: | Okay, so we'll just cancel it |
| L.G.: | Okay, alright thank you |
| PERWAIZ: | Alright, bye bye |

27. L.G. disclosed to investigators that PERWAIZ, in past encounters, had pushed her to undergo a hysterectomy. L.G. further disclosed that PERWAIZ performed hysterectomies on her mother, sister, and cousin.

## Hysterectomies

28. On August 20, 2019, D.B., a 56-year-old female, presented to Lakeview OB/GYN, Suffolk, VA for an ultrasound follow up. The ultrasound was ordered to address D.B.'s initial complaint of post-menopausal vaginal bleeding. Dr. A, M.D., documented the presence of uterine fibroids, a right simple cyst, and a possible hydrosalpinx. Hydrosalpinx refers to a fallopian tube that is blocked with a watery fluid. At the time of the encounter, D.B. was experiencing intermittent monthly spotting. She denied having abdominal pain and vaginal discharge. Dr. A scheduled a 2-week follow up appointment.

29. D.B. subsequently learned that Dr. A did not take her insurance. As a result, she sought treatment with PERWAIZ. On September 24, 2019, the contents of D.B.'s medical records at Lakeview Medical were faxed to PERWAIZ's practice. The records included Dr. A's course of treatment, described *supra*, and records from her primary care physician, Dr. B, M.D. Dr. B included an ultrasound report by Women's Center at Harbour View, which documented the findings referenced supra. The records from Dr. A and Dr. B were entered into D.B.'s medical record at PERWAIZ's practice.

30. On September 30, 2019, PERWAIZ examined D.B. He entered a progress note in her patient chart indicating D.B.'s complained of pelvic pain, pressure and constant cramping. PERWAIZ wrote,

> "…All options discussed. Advised (+ she prefers) Abd Hyst c Removal of both tubes + Ovaries. Surgery/Risks explained."

31. On October 14, 2019, PERWAIZ prepared a History and Physical Report in anticipation of D.B.'s surgery at Chesapeake General Hospital, Chesapeake, VA. He listed D.B.'s chief complaint as pelvic pain, constant pressure, and persistent cramping. Furthermore, he wrote,

"The patient requesting [sic] removal of the uterus and tubes and ovaries...for the last several months has been having worsening chronic pelvic pain, pressure and persistent cramping and she requests definitive surgical therapy... She denies any postmenopausal bleeding"

"Please note potential risks of the surgery such as infection, hemorrhage during or after surgery, injuries to her bowel, bladder, ureters, blood vessels, and other intraabdominal organs requiring many more operations including colostomy, prolonged use of bladder catheter, need and the risk of blood transfusion as well as serious and at times lethal consequences of blood clots or thromboembolism were explained to her. She was also informed that because of her having had 3 previous cesarean sections, she is at a greater risk to have injuries, especially to her bladder and ureters requiring more operations an some of these injuries may not be recognized until days and weeks after the original procedure requiring prehospitalization, and more surgeries."

32. On October 19, 2019, PERWAIZ performed an abdominal supracervical hysterectomy, bilateral salpingo-oopherectomy and lysis of adhesions. A bilateral salpingo-oophorectomy is the surgery to remove the ovaries and fallopian tubes.

33. An Operation Report prepared by PERWAIZ on October 19, 2019, contained annotations D.B. wanted removal of the uterus, tubes, and ovaries.

34. On November 4, 2019, investigators conducted an interview of D.B. in which she stated she did not want the hysterectomy, but PERWAIZ told her the hysterectomy was her best option. PERWAIZ was the only physician of the three to recommend a hysterectomy. Dr. A discussed various options with D.B. and suggested the best course of action might be a D&C.

35. D.B. never made complaints to PERWAIZ regarding pelvic pain, pelvic pressure, or constant cramping. Furthermore, she maintained that PERWAIZ never discussed other treatment options or the risk of surgery. To the contrary, PERWAIZ only spoke of the risks for ***not*** having the hysterectomy. Specifically, PERWAIZ told D.B. the three fibroids and thickening endometrium might build back up as cancer. Moreover, PERWAIZ never discussed the risks posed to D.B. as a result of her three previous cesarean sections.

36. On October 28, 2019, PERWAIZ's practice submitted three claims to the Blue Cross Blue Shield Federal Employee Program, which is a health care benefit program as defined in 18 U.S.C. § 24(b), on behalf of D.B., for a partial hysterectomy, removal of ovary/tube(s), and adhesiolysis tube ovary. The submission included an annotation referencing the tertiary diagnosis as pelvic and perineal pain. On November 1, 2019, Blue Cross Blue Shield, Federal Employee Program reimbursed PERWAIZ $ 942.22 for the partial hysterectomy.

## CONCLUSION

37. Based on the information and evidence set forth above, I respectfully submit that there is probable cause to believe that JAVAID PERWAIZ has engaged in the following crimes:

COUNT ONE: From at least in or about 2010 through in or about October 2019, in the Eastern District of Virginia, JAVAID PERWAIZ, knowingly and willfully executed and attempted to execute a scheme and artifice to defraud the Virginia Medical Assistance Program (Medicaid) and Blue Cross Blue Shield Federal Employee Program, both health care benefit programs as defined in Title 18, United States Code, Section 24(b), and to obtain by materially false and fraudulent pretenses, representations and promises, money owned by and under the custody and control of said health care benefit program, in connection with the delivery of and payment for health care benefits, items and services, in violation of 18 U.S.C. § 1347. The purpose of the scheme was to obtain health care benefit payments from Virginia Medical Assistance Program (Medicaid) and Blue Cross Blue Shield Federal Employee Program to which JAVAID PERWAIZ was not entitled by submitting, and causing to be submitted, false, fraudulent and fictitious claims to the health care benefit programs.

COUNT TWO: On or about October 28, 2019, in the Eastern District of Virginia, JAVAID PERWAIZ, in a matter involving a health care benefit program as defined in Title 18, United States Code, Section 24(b), knowingly and willfully did make a materially false, fictitious and fraudulent statement and representation, and make and use a materially false writing and document knowing the same to contain a materially false, fictitious and fraudulent statement and entry, in connection with the delivery of and payment for health care benefits, items and services, in that he submitted and caused to be submitted to Blue Cross Blue Shield Federal Employee Program, a claim for health care benefit payments, which falsely and fraudulently represented that PERWAIZ had provided necessary medical care to a Blue Cross Blue Shield Federal Employee recipient, when in truth and fact, as the defendant well knew, the recipient did not present with the symptoms listed and did not need such medical care, all in violation of 18 U.S.C. § 1035.

38. Accordingly, I request that a complaint and arrest warrants be issued charging JAVAID PERWAIZ with such offenses.

FURTHER AFFIANT SAYETH NOT.
Respectfully submitted,

_____
Desiree Maxwell
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on November 8, 2019.

_____
UNITED STATES MAGISTRATE JUDGE